IN THE MATTER OF THE ESTATE OF
G. LEONARD ERICSON, DECEASED.

FIRST CHARTER NATIONAL BANK, EXECUTOR OF THE
WILL OF G. LEONARD ERICSON, PLAINTIFF-APPEL-
LANT, v. HELEN ERICSON, DEFENDANT-APPELLANT,
AND DIANE FRANKLIN, PAULINE KLEPPER, WIL-
LIAM KLEPPER, JOHN EDWARD ERICSON, JOHN E.
ERICSON, JR., JANE ERICSON AND LYNN FRANKLIN
SEWARD, DEFENDANTS-RESPONDENTS.

Argued April 4, 1977—Decided August 3, 1977.

*Mr. Alfred C. Clapp* argued the cause for appellant Helen Ericson (*Messrs. Clapp* and *Eisenberg,* attorneys).

*Mr. Harrison F. Durand* argued the cause for appellant First Charter National Bank (*Messrs. Durand, Twombly & Imbriaco,* attorneys).

*Mr. Woodruff J. English* argued the cause for respondents (*Messrs. McCarter & English,* attorneys).

The opinion of the court was delivered by
MOUNTAIN, J. This is a will construction suit the resolution of which depends in large part upon the interpretation

given the clause in the will which establishes the widow's marital share.

The decedent, G. Leonard Ericson, died December 4, 1969, survived by his wife, Helen Ericson. The couple had no children. On March 7, 1967 Ericson had executed an irrevocable *inter vivos* trust disposing of about one-third of his property. Two days later, on March 9, 1967, he executed a will, which was, however, superseded by a later will, dated March 22, 1967. The latter was admitted to probate. The corpus of the *inter vivos* trust was about $1,000,000 at the time it was created and about $1,500,000 when Mr. Ericson died. His probate assets totaled somewhat more than $2,000,000.

The problem which has arisen and which has provoked this litigation, emanates in large part from a particular provision of the decedent's will, *viz,* Article IV, 1. (a), which reads as follows:

If my wife survives me, I give and bequeath to her "Part A" of my residuary estate which shall be that fraction of my entire residuary estate which shall secure for my estate the maximum marital deduction allowable under the Federal Estate tax law. The numerator of this fraction shall be one-half of my adjusted gross estate (as defined in the Internal Revenue Code, *but after excluding the value of all property passing or having passed outside this Will except joint tenancies*) less the value of all property finally allowed as a marital deduction for property passing to my wife, other than property passing under this Article, and the denominator shall be the value of my entire residuary estate, all based on values as finally determined for Federal Estate Tax purposes. The remaining fraction of my residuary estate shall be called "Trust A" which I herewith give, allocate, convey, transfer and deliver to The First National Bank of Middlesex County, as Trustee, upon the trust set forth below, or if my wife does not survive me, I give, bequeath, allocate, convey, transfer and deliver my entire residuary to The First National Bank of Middlesex County, as Trustee, upon the trust set forth below. [Emphasis added]

The italicized words are hereafter referred to as the "clause in dispute."

As will be seen from what is said below, the introduction of the "clause in dispute" created a contradiction within the marital deduction clause itself. The trial judge resolved the issue by exscinding the "clause in dispute" from the will. The Appellate Division reversed, holding that it should be given full effect. 152 *N. J. Super.* 169 (1976). We disagree and as to this issue we reverse.

 Extrinsic testimony as to the circumstances surrounding the preparation and execution of the will was properly received before the trial judge. *Engle v. Siegel,* 74 *N. J.* 287 (1977); *Wilson v. Flowers,* 58 *N. J.* 250, 262–63 (1971). This uncontradicted evidence firmly supports the conclusion that the will of March 22 was *intended* by the testator to alter the will of March 9 in only *one* respect. There was to be added a new provision leaving a bequest of $1,000 jointly to the testator's brother-in-law and sister-in-law, Felix and Martha Cigolini. It in fact altered the earlier will in *two* respects. In addition to adding the bequest to the Cigolinis, there was also included the "clause in dispute," which had not appeared in the earlier will. Incredibly, as set forth more fully below, no one has any idea why or how the "clause in dispute" came to be so included.

As to the *inter vivos* trust and as to the earlier of the two wills, the testator gave no instructions directly to the attorney who prepared the instruments. Instead, he discussed the matter upon each occasion with a trust officer of the bank which was named as executor and trustee in the will and as trustee of the *inter vivos* trust. The trust officer, in turn, then conferred with the lawyer. The instructions as to the single change to be made in the later (March 22) will were apparently conveyed to the attorney directly by the testator as well as through the bank officer.

At the trial, the trust officer testified as follows:

Q. Now, in connection with the will of March 22, 1967 . . . was that will patterned after an earlier will made by Mr. Ericson on March 9, 1967.

A. Yes, sir. It was supposed to be the same will except for one specific bequest.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. Do you have any recollection as to why a new will was made so shortly after the will of March the ninth?

A. Mr. Ericson felt that he should leave the sister and brother-in-law — her sister and brother-in-law, Cigolini, a specific bequest, and the will was drawn to insert that.

Q. Did you receive your instructions as to the specific bequest to Cigolini from Mr. Ericson?

A. Yes, sir.

Q. And he instructed you to make that change?

A. Yes, sir.

Q. Did he instruct you to make any changes in the will other than that one change?

A. No, sir.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. . . . . My question to you is did you have any instructions from Mr. Ericson to include that phrase [the clause in dispute] which does not appear in the will of March 9, 1967?

A. Absolutely not. In fact, I didn't know it was in there until about three weeks ago.

Q. Have you any explanation as to how that phrase happened to be included?

A. No, sir.

The attorney who prepared the deed of trust and both wills also testified at the trial. He was asked the following questions to which he gave the following answers:

Q. Did you have any instructions that the March 22nd will should be changed to include those words [the clause in dispute] which do not appear in the March 9th will?

A. No, sir.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. My question is did you have any instructions, do your notes or anything whatsoever that you can find indicate any instructions to you to add those words in the will of March 22nd?

A. I had no instruction from anybody.

It is this phrase (the clause in dispute), springing from nowhere and disowned by all, that has caused the problem. It will be seen at once that it introduces into the article of the will that establishes the marital share, not merely an ambiguity, but a sharp contradiction. As this article stood

in the will of March 9th — and as it would stand in the probated will of March 22nd, were the clause in dispute to be exscinded — it would provide an entirely appropriate means of passing to the testator's widow a share of his estate approximating the maximum marital deduction that could be claimed. We know this to have been a principal aim and desire of the testator. As he had stated in the immediately preceding sentence of the will,

> If my wife survives me I give and bequeath to her . . . that fraction of my entire residuary estate which shall secure for my estate the maximum marital deduction allowable under the Federal Estate tax law.

On the other hand, if the mysterious "clause in dispute" is allowed to remain, the marital share will be reduced by about $800,000 and taxes increased by about $285,000.[1]

There is general agreement that we must seek testamentary intent. Where more than one intention can be discerned, and where the fulfillment of the several intentions presents a conflict, it becomes also necessary, in resolving the conflict,

---

[1]This results from the interplay of several factors. As is discussed below, the testator died less than three years after having created the *inter vivos* trust. Hence, presumptively at least, the assets of this trust are includible in his taxable estate. If finally determined to be so includible, the resulting death duties will exceed the non-marital share. The tax clause in the will directs that all taxes be paid from the non-marital share. To the extent that total taxes exceed this share, they must be paid either from the marital share or from assets of the *inter vivos* trust. Should excess taxes be paid in whole or in part from the marital share — as urged by the remaindermen of the *inter vivos* trust and by the Internal Revenue Service — the marital share and marital deduction would be diminished by the amount of such payment.

Secondly, and more significantly, if the "clause in dispute" is given effect, it will exclude from the numerator of the fraction to be used in determining the marital share, the value of all assets contained in the *inter vivos* trust. This will sharply reduce both the marital share and the marital deduction, thus, as mentioned above, diminishing the outright bequest to the widow by about $800,000 and increasing taxes by about $285,000.

to decide which intent is dominant and hence should prevail. From a careful study of the dispositive instruments as well as the transcript of the testimony received at trial, it seems to us that three intentions manifest themselves in varying degrees of significance:

1. The testator wished to make generous provision for his wife. This, we are certain, was his *dominant* intent.

2. He wished to divide his property in such fashion that two-thirds of his assets would eventually pass to his side of the family, nephews and nieces, and one-third to his wife's family, an only nephew.

3. He wished to minimize taxes.[2]

## GIFTS TO WIFE

In seeking to arrive at a testator's probable intent, this Court has acknowledged the wisdom of attributing to the testator those common human impulses which we all readily recognize and to the compulsion of which we instinctively respond. *Fidelity Union Trust Co. v. Robert,* 36 *N. J.* 561, 565 (1962); *In re Estate of Burke,* 48 *N. J.* 50, 64 (1966). It is certainly a common impulse for a wealthy man, with no children, to make generous provision for a wife with whom he has happily spent most of his adult years. This is especially true when the wife has few assets of her own.

Mr. Ericson was clearly moved by such an impulse. He bequeathed to his wife all of his tangible personalty. He made her the life beneficiary of the *inter vivos* trust of March 7, 1967. He gave her outright the marital share designated in the will as "Part A." He made her life beneficiary of the non-marital trust, designated "Trust A." Otherwise stated,

---

[2]We have made no real effort to decide which of 2 and 3 above was the stronger purpose in the mind of Mr. Ericson. Both, we are satisfied, were far less important than his obvious desire to deal most generously with his wife.

he gave to his wife for her life the income from about two-thirds of his estate, and gave her the other third outright. But he went even further. Both with respect to the trust created during his lifetime, as well as with respect to the non-marital trust appearing in his will, he empowered his trustee to invade principal, if need be, for his wife's further comfort and protection. Article I, 1. (b) of the irrevocable trust reads as follows:

> Whenever my Trustee, in its sole and absolute discretion, determines that my wife's income from all sources known to my Trustee is not sufficient for her reasonable support, care, comfort and maintenance, my Trustee may pay to or use for her benefit, so much of the principal as my Trustee determines to be required for these purposes.

The corresponding clause in the will is in almost identical terms. Finally, he sought to immunize the marital share, left to his wife outright, from the impact of death taxes by providing that these should all be paid from the non-marital share of the residue.

The most natural and normal plan of testamentary disposition for a man in Mr. Ericson's position would be to provide for his wife — who had almost no property of her own — with the utmost generosity. Her claim to his bounty — which he fully recognized — was far greater than any claims of nephews or nieces. The provisions of the *inter vivos* trust and of the earlier will (March 9) were directly responsive to this natural impulse. The "clause in dispute," were it to be given effect, would very substantially frustrate what seems obviously to have been Mr. Ericson's dominant purpose.

## THE ONE THIRD-TWO THIRDS PLAN AS TO NEPHEWS AND NIECES

The evidence is clear that the testator did initially express the wish that his property should ultimately be divided in such manner that approximately one-third would

pass to his wife's nephew and two-thirds to his own nieces and nephews. The trust officer and the attorney perhaps sought, in a rather general and wholly unsophisticated way, to carry out this wish. Using round numbers, about one-third of Mr. Ericson's property was placed in the *inter vivos* trust, one-third allocated to the marital share and one-third to the non-marital trust. In the event that Mrs. Ericson should survive her husband — as in fact occurred — the principal of each of the two trusts (*inter vivos* and non-marital) passes upon her death to the testator's nieces and nephews. Presumably Mrs. Ericson's nephew would have been expected to receive, at the time of her death, the one-third portion that this tentative arrangement allocated to her marital share.

This three-way division of gross assets was as far as the parties ever went to fulfill this wish of the testator. No steps were taken to discover how much of each of these three shares might be expected ever to reach the ultimate recipients. For instance, no calculations were made to learn the probable impact of death duties and administration expenses or to determine the sufficiency of the non-marital share to meet the totality of these foreseeable outlays.[3] Furthermore, although Mr. Ericson was 75 years old in 1967, it appears to have occurred to no one that he might die within a three-year period. This he in fact did, with the result that the assets in the *inter vivos* trust are, as we have already pointed out, presumptively includible in his estate both with respect to the federal estate tax and the New Jersey transfer inheritance tax. 26 *U. S. C. A.* § 2035; *N. J. S. A.*

---

[3] It will be recalled that the tax clause in the will directed that all death duties be paid from the non-marital share. If the assets constituting the *inter vivos* trust are eventually held to be includible in the taxable estate as having been the subject of a gift in contemplation of death, then this entire "third" — the non-marital share — will be completely exhausted in paying taxes. No part of it will reach any of the intended recipients.

54:34–1c. The Internal Revenue Service has already ruled in favor of taxability as to the federal estate tax and that issue is pending on appeal before the United States Tax Court. Death within three years of making the *inter vivos* trust, foreseeable as it was and fraught as it was with potential tax consequences of great import, appears never to have been taken into account.

Thus we find it difficult to attribute any great significance to Mr. Ericson's statement of desire as to the proposed one third-two thirds division. Only vague initial steps — utterly inadequate — were ever taken to achieve this purpose. Nothing further was ever done to implement it. It is pointed out by way of argument that to give effect to the "clause in dispute" will result in a closer approximation of this intended division than might otherwise be the case. But this is to give controlling significance to what is, in truth, no more than a coincidental fortuity. The argument must otherwise presuppose that the "clause in dispute" was purposely included as a means of attaining this result. Here, however, not only does the attorney who drew the will disavow any such purpose, but moreover it cannot be seriously argued that a scrivener, intent upon achieving the one third-two thirds division, would have sought to do so in so maladroit a fashion. He would certainly have employed some more direct and appropriate means to accomplish this end.

## MINIMIZATION OF TAXES

It is argued that Mr. Ericson was uninterested in minimizing taxes, because he never discussed the subject. This conclusion is not justified. Every testator is entitled to assume, absent evidence to the contrary, that his lawyer will undertake to accomplish his testamentary wishes with as little tax impact as possible. Furthermore, it is normally and quite rationally presumed that this is what the testator wishes. Any other belief, absent evidence to support it, is fatuous.

The will itself shows every indication that taxes were to be minimized. Article IV, 1.(a) states, as we have noted

above, that the testator sets aside as his wife's marital share, "that fraction of my entire residuary estate which shall secure for my estate the maximum marital deduction allowable under the Federal Estate tax law." The provision of the will immediately following the marital deduction clause directs that only qualified assets shall be allocated to the marital share, thus insuring that the deduction will not be reduced by the inclusion of non-qualified property. Article II seeks to immunize the marital share from the payment of all death duties. While, as mentioned above, this latter provision results in avoiding any diminution of the marital share that would result were it to bear any part of the tax burden, at the same time it improves the overall tax picture by maintaining the marital deduction at its maximum amount.

## THE CLAUSE IN DISPUTE

On the record before us we conclude, as did the trial judge, that this clause should be exscinded from the will. As we have recently had occasion to note, this Court is committed to the doctrine of probable intent. *Engle v. Siegel, supra.* At least since *Wilson v. Flowers,* 58 N. J. 250, 262–63 (1971) we have shown great willingness to receive extrinsic evidence bearing upon a testator's probable wishes. If this doctrine is to achieve and maintain credibility, we cannot ignore what such proofs disclose. The evidence in this case makes clear, beyond any doubt, that this clause found its way into the will purely by some now undiscoverable inadvertence. No one has in any way sought to impugn the veracity of those witnesses who testified at the trial. The attorney and the trust officer did not say merely that they did not *remember* receiving instructions to include the "clause in dispute"; each stated unequivocally and categorically that no such direction was ever given. Upon such a record the clause should be exscinded.

Doubly is this so where the testator's dominant intent, as well as a significant subsidiary intent, are both utterly frustrated by its inclusion.

Both the trial court and the Appellate Division held that to the extent the non-marital share was insufficient to pay taxes, they should be paid out of the *inter vivos* trust rather than from the marital share. This issue is not strenuously challenged here. In any event we entirely agree with the courts below for the reasons expressed in their respective opinions.

The judgment of the Appellate Division is affirmed in part and reversed in part as set forth above.

SULLIVAN, J., and CLIFFORD, J., dissenting. We would affirm the judgment substantially for the reasons expressed in the opinion of the Appellate Division.

*For affirmance in part and reversal in part*—Chief Justice HUGHES and Justices MOUNTAIN, PASHMAN, SCHREIBER and HANDLER—5.

*For affirmance*—Justices SULLIVAN and CLIFFORD—2.